# STATE OF TENNESSEE
## CHANCERY COURT OF SEVIER COUNTY
## AT SEVIERVILLE

RAY GRANTHAM, D/B/A RIVERCHASE MOTEL
Plaintiff

VS.                                        NO. 09-1-014

THE NEHERLANDS INSURANCE COMPANY
Defendant

### SUMMONS IN CIVIL ACTION

To the above named Defendant(s): THE NETHERLANDS INSURANCE COMPANY
                                 SERVE COMMISSIONER OF INSURANCE
                                 500 James Robertson Parkway
                                 Nashville, TN 37243-1131

You are hereby summoned and required to serve upon Dudley W. Taylor, Petitioner's Attorneys, whose address is PO Box 31705, Knoxville, TN 37930 a copy of the Answer to this Complaint, with the original Answer to be filed with the Court, Room 108W, 125 Court Avenue, Sevierville, TN 37862, which is herewith served upon you within thirty (30) days after service of this summons upon you, exclusive of the day of service. If you fail to file a response or answer or enter your appearance in this case, any or all of the matters contained herein, which come before this Court, may be decided without any further notice to you.

Witness, CAROLYN P. MCMAHAN, Clerk & Master of said Court, at office the 14th day of January A.D., 2009 at 3:45 o'clock P.M.

CAROLYN P. MCMAHAN<br>
Clerk & Master<br><br>
By <em>Barbara Atchley</em><br>
Deputy Clerk & Master

DEFENDANT'S COPY

**EXHIBIT**

1

# NOTICE

TO THE DEFENDANTS(S):

Tennessee law provides a four thousand dollar ($4,000) personal property exemption from execution or seizure to satisfy a judgment. If a judgment should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the clerk of the court. The list may be filed at any time and may be changed by you thereafter as necessary; however, unless it is filed before the judgment becomes final, it not be effective to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed; these include items of necessary wearing apparel for yourself and your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible, and schools books. Should any of these items be seized you would have the right to recover them. If you do not understand, your exemption right or how to exercise it, you may wish to seek the counsel of a lawyer. [TCA 26-2-114]

Received this _____ day of _____, 2009. _____,
Deputy Sheriff.
(This summons is issued pursuant to Rule 4 of the Tennessee Rules of Civil Procedure.)

## RETURN ON SERVICE OF SUMMONS

I hereby certify and return, that on the _____ day of _____, 2009, I

served this summons together with the complaint herein as follows: _____

_____

_____

_____
                 Sheriff-Deputy Sheriff

## PRIVATE PROCESS RETURN

I hereby certify and return, that on the _____ day of_____,
2009, I personally served this summons together with the complaint
herein as follows: _____

_____
Signature

_____
Printed Name

_____
Address

_____

## DEFENDANT'S COPY

## IN THE CHANCERY COURT FOR SEVIER COUNTY, TENNESSEE

| | |
|---|---|
| RAY GRANTHAM, | § |
|    d/b/a RIVERCHASE MOTEL | § |
| | § |
|    Plaintiff, | § |
| | § |
| vs. | §    Docket No. _____ |
| | § |
| THE NETHERLANDS INSURANCE COMPANY | § |
| | § |
|    Defendant. | § |

### S U M M O N S

**To:  Defendant THE NETHERLANDS INSSURANCE COMPANY, c/o State of Tennessee Commissioner of Insurance and Commerce, 500 James Robertson Pkwy, Nashville, TN 37243-0565**

     You are hereby summoned and required to serve upon **Dudley W. Taylor**, Plaintiff's attorneys, whose address is: **The Taylor Law Firm, 110B Perimeter Park Road, Knoxville, TN 37922** a true copy of the answer to the complaint which is herewith served upon you, within 30 days after service of this summons upon you, exclusive of the day of service.  You will file the original with the Court.

     If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.

     Issued this _____ day of _____, 2008, at _____ o'clock, ____M.

     Witness, _____, Chancery Court Clerk, at office in Knox County, TN.

_____
                    COURT CLERK

(This summons is issued pursuant to Rule 4 of the Tennessee Rules of Civil Procedures.)

### NOTICE

**To the Defendant(s):**

     Tennessee law provides a Four Thousand Dollar ($4,000.00) personal property exemption from execution or seizure to satisfy a judgment.  If a judgment should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the clerk of the court.  The list may be filed at any time and may be changed by you thereafter as necessary; however, **unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list.**  Certain items are automatically exempt by law and do not need to be listed; these include items of necessary wearing apparel for yourself and your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible and school books.  Should any of these items be seized, you would have the right to recover them.  If you do not understand your exemption right or how to exercise it, you may wish to seek the counsel of a lawyer.  TCA 26-2-114

Received this ____ day of _____, 2008.

_____
                    PROCESS SERVER

### DEFENDANT'S COPY

christy/Graham    15.02005
Summons.Ins.4.11.07

## RETURN ON SERVICE OF SUMMONS

I hereby certify and return that on the _____ day of _____, 2008, I served this summons together with the complaint as follows: _____

_____

I failed to serve this summons within thirty (30) days after its issuance because:

_____

_____
PROCESS  SERVER

DEFENDANT'S COPY

# IN THE CHANCERY COURT FOR SEVIER COUNTY, TENNESSEE

RAY GRANTHAM,
    d/b/a RIVERCHASE MOTEL

    **Plaintiff,**

vs.

THE NETHERLANDS INSURANCE COMPANY

    **Defendant.**



§
§
§
§
§
§
§
§
§
§
§
§

Docket No. *09-1-014*

## COMPLAINT FOR DECLARATORY JUDGMENT AND OTHER RELIEF

Plaintiff, by and through undersigned counsel, hereby states his cause of action as follows:

1.    Plaintiff Ray Grantham ("Plaintiff") is an individual resident of Sevier County, Tennessee. Among other activities, Plaintiff owns and operates the Riverchase Motel (the "Motel"), also located in Sevier County, Tennessee.

2.    Defendant The Netherlands Insurance Company ("Netherlands" or the "Insurer") is an insurance company which, upon information and belief, is incorporated under the laws of the state of Massachusetts. It has qualified to do business in Tennessee.

3.    Plaintiff procured and paid the premium for a commercial property insurance policy (the "Policy") from Netherlands, which Policy was issued May 4, 2004. The Insurer assigned the number CP 9616048 to this Policy and a copy is attached as **Exhibit 1**.

4.    The Policy insured the improvements constituting the Motel located in Pigeon

Forge, Sevier County, Tennessee, and designated by street address as 3709 Parkway, Pigeon Forge, Tennessee 37862. The coverage limit on the Motel was $3,001,300 with a deductible of $1,000.

5.    The Policy also covered business personal property (the "Personalty") associated with the operation of the Motel. There was no separate deductible applicable to the Personalty.

6.    The Policy also provided for other coverages, as described in Exhibit 1. These additional coverages included business income and extra expense with policy limits of $200,000.

7.    The Motel and some of the associated Personalty were badly damaged as the result of a fire occurring on April 24, 2005. The damage was sufficiently extensive that the operations of the Motel were significantly limited for a period of time.

8.    Plaintiff promptly gave notice of the occurrence of this loss through notification of the agency which sold the Policy and then directly to the Defendant. Plaintiff thereafter fully cooperated with the Defendant and its representatives in an effort to restore the Motel premises as quickly as possible. Plaintiff even undertook much of the restoration work himself, but only after giving appropriate notice to the Defendant.

9.    The Insurer initially assigned its representative, Robert E. Smith ("Smith") to deal with this loss. Smith, on behalf of the Insurer, retained Braun Construction Services, Inc. ("Braun") as the "restoration contractor."

10.    Braun undertook emergency measures to prevent further damage from exposure to the elements, for which it significantly overcharged. Plaintiff protested these overcharges but the Defendant and Smith were seemingly uninterested in resisting these overcharges.

11.    Braun also attempted to assess the scope of the damage and to provide its estimate

as to the work necessary to restore the Motel to its pre-fire condition. However, Braun overlooked many necessary items of work in its attempt at the analysis.

12.     After Plaintiff complained to the Defendant about the overcharges of Braun and the deficiencies in its analysis of the cost of repairing the Motel, Smith claimed that Braun had been recommended by the agency which procured the Policy. That assertion was false and the agency promptly notified Plaintiff and Defendant of the inaccuracy of that statement.

13.     The unwillingness of the Defendant and Smith to look into the question of overcharges is baffling. Plaintiff has been provided with an excerpt from the deposition of Braun's principal in which he asserted that the "insurance adjustor" asked Braun to inflate the charges for leasing scaffolding, among others, so that the adjustor "could pay that and close its file on that part of the claim."

14. The Braun principal further stated as follows in sworn testimony:

> "This is not -- it has nothing to do with commercial type
> construction, okay? It's insurance.

15.     Despite his unwillingness to look into what appeared to be overcharges on the part of Braun, Smith thereafter took the position that co-insurance was applicable such that Plaintiff could recover only a portion of his actual loss. Smith maintained this position for well over a year without any support for the assertion. Plaintiff was forced to hire an attorney to deal with this issue, among other issues.

16.     Smith first asserted that co-insurance would be determined by using replacement cost format. Plaintiff's attorney pointed out to Smith that the Policy language referred to the "value of Covered Property at the time of loss." The attorney further reminded that all of the examples referred to value at the time of loss and made no mention of replacement cost. Finally,

Grantham 15.02005                                    3
Complaint.1.14.09

DEFENDANT'S COPY

the attorney reminded Smith that even assuming that replacement cost in comparison to insurance coverage would be utilized to determine co-insurance, there was no appraisal that would justify application of co-insurance.

17.     The issue of appraisal of the Motel was a recurring theme utilized by Smith in what appeared to be a deliberate effort to confuse issues and cause additional problems for Plaintiff. Smith asserted in a letter dated December 19, 2005 that he had retained "the services of a Professional Property Appraisal [sic]" to render a professional opinion as to the replacement cost of all of the insured property.

18.     Smith wrote again through letter dated December 23, 2005 asserting again that he was "hiring an independent, commercial property appraiser to determine the replacement cost value as of the date of loss for all the property." However, Smith never addressed the issue of what this appraisal would have to do with either co-insurance or determining the amount to be paid to Plaintiff under the Policy.

19.     Plaintiff's attorney wrote to Smith on a number of occasions citing Policy language in support of the right of Plaintiff to recover his full loss without regard to co-insurance. Smith generally avoided responding to these points, instead asserting that he did not see any merit in "arguing over page 13 versus page 16" and that it did no good to "look at page 46 of the policy booklet." Indeed, Smith left the impression that he believed that Policy language had little to do with Plaintiff's insurance claim.

20.     As noted above, Smith asserted on several occasions in writing in December, 2005 and January, 2006 that he had hired an appraiser to determine the replacement value of the Motel. Smith was succeeded by Anthony DeCesare ("DeCesare") who then asserted in a letter

Grantham 15.02005                                4
Complaint.1.14.09

DEFENDANT'S COPY

of March 30, 2006 that "we have valued the property and determined that the insured does not comply with the co-insurance condition as it pertains to claims at replacement cost." However, Plaintiff and his attorney were not provided with an appraisal and were never able to obtain from DeCesare any clarification of his assertion that "we have valued the property."

21.    In late May, 2006, Plaintiff's attorney was contacted by a Knoxville based appraiser, Ken Woodford. Woodford informed that he had been retained to appraise the Motel. It was evident that no such appraisal had been previously obtained by the Insurer, despite the assertions of DeCesare and Smith as set out above.

22.    The appraiser later made direct contact with Plaintiff and went to Plaintiff's place of business to appraise the Motel. Plaintiff cooperated in this respect just as he had attempted to cooperate with Defendant immediately upon the occurrence of the fire.

23.    To date, Plaintiff has not been provided with a copy of the completed appraisal, nor, indeed, with any appraisal information. Despite having retained a highly qualified appraiser and proposing to have the Motel appraised for nearly two years, Defendant thereafter adopted different tactics without ever disclosing what it learned as a result of the appraisal.

24.    Defendant through its representatives has also engaged in this frustrating tactic. It solicited a face-to-face meeting with the Plaintiff. Plaintiff agreed to the requested meeting, after initial reluctance. Upon being notified that Plaintiff consented to meet with the insurance representatives, these representatives then took the position that they would not meet until Plaintiff had provided every bit of documentation relating in any way to the loss. Although conditioning meeting on providing all of this documentation, the Defendant's representatives did not identify such documentation.

Grantham 15.02005
· Complaint.1.14.09

5

DEFENDANT'S COPY

25.    Shortly after the time that Plaintiff and his attorney were contacted by the appraiser, Woodford, Plaintiff received a notice from Defendant's attorney directing that Plaintiff submit to an examination under oath. This occurred despite the fact that Defendant had earlier used the excuse that it could not accurately evaluate and settle the loss claim without completing the long promised or threatened appraisal.

26.    Plaintiff's attorney requested the opportunity to also depose or examine under oath the Defendant's representatives, Smith and DeCesare. The Defendant through its attorney declined to permit this questioning. Despite this unwillingness to accord similar treatment, Plaintiff agreed to be examined under oath at the date and time directed by Defendant and its attorney.

27.    Plaintiff answered to the best of his knowledge every question put to him during the examination under oath. At the conclusion of this examination, Defendant's representatives proposed to come to the site of the Motel and meet with Plaintiff in an effort to resolve the remaining issues. Plaintiff readily agreed to such a meeting.

28.    Following the examination under oath, Plaintiff's attorney wrote to Defendant's attorney through letter dated January 26, 2007. A copy of this letter is attached as **Exhibit 2**.

29.    Plaintiff and his attorney anticipated at the conclusion of the examination under oath that the meeting would be held soon thereafter. Unfortunately, the Defendant's representatives asserted that it would be two months or more before they would be available to meet with Plaintiff. Nonetheless, Plaintiff agreed to make himself available for such meeting, although disappointed at the additional significant delay.

30.    DeCesare thereafter wrote to Plaintiff confirming the meeting for March 27, 2007

DEFENDANT'S COPY

and requesting that he have certain documentation available at the meeting. Most of the requested items appeared to relate to the fire loss and reconstruction activity. However, the Defendant also requested "complete 2005 State and Federal Tax Returns with schedules."

31.     Plaintiff's attorney then wrote to Defendant's attorney to first express his disappointment and that of Plaintiff that the Defendant's representatives could not meet with Plaintiff any earlier than March 27, 2007. Plaintiff's attorney also pointed out that the request for copies of the 2005 state and federal tax returns did not make sense in light of the asserted focus on the building damage claim.

32.     Defendant's representative, DeCesare then wrote to Plaintiff through letter dated March 15, 2007 and received on March 19, 2007, directing that all of the requested material should be provided in advance of the meeting and by no later than Wednesday, March 21, 2007. Plaintiff is kept quite busy in overseeing the Motel and other family enterprises, including a motel located in Florida. Even if Plaintiff had no other duties to occupy his time, it would have been difficult to provide the materials in advance of the meeting and on two days notice. With this busy schedule, it was impossible.

33.     Plaintiff protested through his attorney, who also again reminded of the questions raised in response to the earlier request for records. In particular, Plaintiff's attorney questioned the relevance of copies of the entire 2005 state and federal tax returns for Plaintiff and his spouse and the additional request for copies of the 2006 returns. However, Plaintiff's attorney agreed in an exchange of correspondence with Defendant's attorney, that all schedules relevant to the operation of the Motel would be made available along with the other requested records.

34.     Defendant then informed through counsel that its representatives would not meet

DEFENDANT'S COPY

with Plaintiff and his wife. This was attributed to the failure to provide the requested documents prior to the meeting.

35.     It is readily evident that Defendant, and in particular, DeCesare and Smith, have no intention of resolving the insurance claim in a reasonable manner. To the contrary, their actions smack of bad faith.

36.     Most of the discussions between Plaintiff and Defendant's representatives have centered on the damage to the Motel. However, Plaintiff suffered a loss of personal property in the fire, referred to above as Personalty. The Defendant has not compensated for this covered loss.

37.     Additionally, the Plaintiff suffered business interruption as a result of the fire. Defendant has again failed to compensate for this covered loss. Defendant has also taken the position with respect to the business interruption coverage that co-insurance will limit Plaintiff's recovery.

38.     The Policy provides for replacement cost coverage for covered improvements to real property. The Policy also provides coverage for business personal property. The reasonable cost to restore the Motel to its condition prior to the occurrence of the fire, taking into account this replacement cost endorsement, and including the damaged Personalty, is $1,716,833.00.

39.     Defendant has paid to-date the sum of $1,191,608.00 toward this loss. Plaintiff is therefore entitled to recover $524,225.00 as the additional amount of the insured loss, after taking into account the deductible of $1,000.

40.     The Policy also provides for business interruption coverage, entitled "business income and extra expense." The coverage limit was $200,000 and Plaintiff's loss exceeded that

Grantham 15.02005
Complaint.1.14.09                                    8

DEFENDANT'S COPY

sum. All payments made by Defendant have been credited against the replacement cost coverage for the improvement to the real property and the business personal property as described in Paragraph 39 above. Plaintiff is therefore entitled to recovery of $200,000.00 under this business interruption coverage.

41.     This is an appropriate matter for the Court to determine and declare the rights and liabilities of the parties with respect to the Policy. It is first requested that the Court determine and declare that the Policy which Defendant admits was in full force and effect on the occurrence of the loss, provides for full coverage of the policy limits without application of the co-insurance feature. Next, that the Court determine and declare that Plaintiff is entitled to recover under the Policy, the additional amount of $724,225.00.

42.     The Insurer has engaged in unfair or deceptive acts and practices. Such acts and practices are prohibited under the Tennessee Consumer Protection Act (the "Act") as codified in T.C.A. §47-18-101, et seq.

43.     Unfair or deceptive acts or practices affecting the conduct of any trade or commerce are deemed unlawful acts or practices and are prohibited by T.C.A. § 47-18-104, codified from the Act. It is further provided in T.C.A. § 47-18-102, that the Act shall be liberally construed to protect consumers from those who engage in unfair or deceptive acts or practices, among other policies and purposes.

44.     A private right of action is provided by T.C.A. § 47-18-109 for any person who suffers an ascertainable loss as a result of the use or employment of an unfair or deceptive act or practice. Recovery may be had even for negligent conduct, and if the unfair or deceptive act or practice was willful or knowing, the court may award treble damages.

**DEFENDANT'S COPY**

45.     The Act also provides, as codified in T.C.A. § 47-18-109(e)(1), reasonable attorney's fees and costs upon the finding of a violation of the Act.

46.     The actions of the Insurer constitute unfair or deceptive acts and practices. The deceptive acts and practices were undertaken and performed in order to defraud and damage Plaintiff. These deceptive acts and practices include, but are not limited to, the refusal of Smith and DeCesare to abide by specific Policy provisions and indeed, declaring that the Policy language had little to do with Plaintiff's claims.

47.     Plaintiff has suffered an ascertainable loss as defined in T.C.A. § 47-18-109 and has incurred significant attorney fees and costs. The actions of Defendant which resulted in these damages to Plaintiff were willful or knowing and Plaintiff therefore seeks recovery from Defendant of three times the actual damages sustained by him, along with his reasonable attorney fees and costs.

48.     Plaintiff has suffered direct and consequential damages in amount of not less than $724,225.00 by reason of underpayment of its insured losses under the Policy, incurred as a result of the unfair and/or deceptive practices of the Defendant.

49.     Plaintiff is therefore entitled to recover his damages as stated above, under the Act. Since the unfair and/or deceptive acts or practices were willful and/or knowing, these damages should be trebled and Plaintiff should further be awarded its attorney fees and costs.

50.     Alternatively to recovery under the Act, Plaintiff is entitled to recover his insured losses, less deductibles in the amounts as set forth above, pursuant to enforcement of the Policy. Further, Plaintiff is entitled to recover the bad faith penalty of 25% pursuant to T.C.A. § 56-7-105.

DEFENDANT'S COPY

51.     The Defendant has refused to pay the covered loss within 60 days after the demand has been made by Plaintiff. This refusal to pay was not in good faith and this failure inflicted additional expenses, loss or injury including attorney fees, upon Plaintiff.

52.     In further alternative, Plaintiff asserts that he is entitled to recover damages by reason of fraud, deceit, conversion and/or negligent misrepresentation on the part of the Defendant.

53.     As additional alternative relief, Plaintiff seeks recovery of punitive damages by reason of the intentional, fraudulent, malicious and/or reckless actions of the Defendant.

54.     This suit was originally filed on April 12, 2007. The Defendant thereafter removed to the United States District Court for the Eastern District of Tennessee, being case number 3:07-CV-198.

55.     The Plaintiff subsequently took a voluntary non suit in the original case, pursuant to Order entered on January 14, 2009.

WHEREFORE, it is prayed as follows:

A.     That the Court determine that the actions of the Defendant constituted violations of the Tennessee Consumer Protection Act therefore resulting in a judgment against the Defendant of three times the actual underpayment of covered losses of not less than $724,225.00;

B.     That Plaintiff have and recover judgment for all reasonable attorney fees and costs incurred by him attributable to the violations of the cited Act;

C.     That as an alternative to recovery under the Act, the Policy be enforced and Plaintiff be awarded his covered losses under the Policy for the damaged Motel, Personalty and Business Interruption in the additional amount of not less than $724,225.00.

D.     That as a further alternative to recovery under the Act, Plaintiff be awarded the bad faith penalty of 25%, or in such other amount as the Court determines appropriate, pursuant to T.C.A. § 56-7-105;

E.     That as an alternative to recovery under the Act, Plaintiff be awarded his direct and consequential damages suffered by reason of fraud, deceit, conversion and/or negligent misrepresentation on the part of the Defendant, with such direct and consequential damages being in the amount of not less than $724,225.

F.     That as an further alternative to recovery under the Act, Plaintiff recover punitive damages from the Defendant in the amount of $1,000,000 by reason of Defendant's intentional, fraudulent, malicious and/or reckless actions; and

G.     That Plaintiff have and recover such other and further relief as the Court may determine appropriate under the circumstances.

**A JURY IS REQUESTED TO HEAR THIS CAUSE.**

Respectfully submitted this _14th_ day of January, 2009.

**THE TAYLOR LAW FIRM**

By: _Dudley W. Taylor_   By Person JST

Dudley W. Taylor, BPR #000653
Attorneys for Plaintiff
PO Box 31705
Knoxville, TN  37930-1705
(865) 539-1067

**DEFENDANT'S COPY**

## COST BOND

We hereby acknowledge ourselves as surety for the costs, taxes and damages in this cause in accordance with T.C.A. § 20-12-120.

_____
DUDLEY W. TAYLOR

# Exhibit 1

DEFENDANT'S COPY

RENEWAL



**Indiana Insurance**™
Member of Liberty Mutual Group

**Forming a part of**

| Policy Number: CP  9616048 |
|---|

**Coverage Is Provided In  THE NETHERLANDS INSURANCE COMPANY-A STOCK COMPANY**

| Named Insured:<br>RIVERCHASE MOTEL & NIGHMARE<br>MINI GOLF DBA RAY GRANTHAM | Agent:<br>INTER-AGENCY INSURANCE SERVICE<br><br>Agent Code: 3216458      Agent Phone: (865)-637-4519 |
|---|---|

## COMMERCIAL PROPERTY COVERAGE PART DECLARATIONS

### DESCRIPTION OF PREMISES

| Prem.<br>No. | Bldg.<br>No. | Location<br>Occupancy, Construction/Fire Protection |
|---|---|---|
| 1 | 1 | 3709 PARKWAY<br>PIGEON FORGE  TN   37862<br>HOTEL/MOTEL-4/MORE STY(LESSOR)<br>MODIFIED FIRE RESISTIVE |
| 1 | 2 | HOTEL/MOTEL-4/MORE STY(LESSOR)<br>MODIFIED FIRE RESISTIVE |
| 1 | 3 | HOTEL/MOTEL-4/MORE STY(LESSOR)<br>MODIFIED FIRE RESISTIVE |

### COVERAGES PROVIDED:

Insurance at the described premises applies only for coverages for which a limit of insurance is shown or for which an entry made. (The Coinsurance column reflects Coinsurance %, Extra Expense %, Limits on Loss Payment or Value Reporting Symbol.)

| Prem.<br>No. | Bldg.<br>No. | Coverage | Limit of<br>Insurance | Causes of<br>Loss Form | Coinsurance |
|---|---|---|---|---|---|
| *** | *** | COVERAGES - BLANKET 01: | $   3,001,300 | SPECIAL | 9 |
| 1 | 1 | BUILDING | BLANKET 01 | | |
| 1 | 1 | YOUR BUSINESS PERSONAL PROPERTY | BLANKET 01 | | |
| 1 | 2 | BUILDING | BLANKET 01 | | |
| 1 | 3 | BUILDING | BLANKET 01 | | |
| 1 | 1 | BUSINESS INCOME AND EXTRA EXPENSE<br>"RENTAL VALUE" | $     200,000 | SPECIAL | 9 |

**DEFENDANT'S COPY**

21-7 (07/03)

**COMMERCIAL PROPERTY COVERAGE PART DECLARATIONS (continued)**

OPTIONAL COVERAGES:

| rem. o. | Bldg. No. | Coverage | Agreed Value Amount Expiration Date | Replacement Cost | Inflation Guard |
|---------|-----------|----------|-------------------------------------|------------------|-----------------|
| 1 | 1 | BUILDING | | INCLUDED | |
| 1 | 1 | YOUR BUSINESS PERSONAL PROPERTY | | INCLUDED | |
| 1 | 2 | BUILDING | | INCLUDED | |
| 1 | 3 | BUILDING | | INCLUDED | |

Replacement cost for Your Business Personal Property also applies to Stock if an asterisk (*) is present.

EDUCTIBLE:  $  1,000

ORTGAGE HOLDERS:   REFER TO ADDITIONAL INTERESTS SCHEDULE

**ORMS AND ENDORSEMENTS**

orms and Endorsements applying to this Coverage Part and made part of this policy:

| rm Number | | Description |
|-----------|---|-------------|
| F175 | - 0186 | QUICK REFERENCE-COMMERCIAL PROPERTY COVERAGE PART |
| P0010 | - 0402 | BUILDING AND PERSONAL PROPERTY COVERAGE FORM |
| P0030 | - 0402 | BUISNESS INCOME (AND EXTRA EXPENSE) COVERAGE FORM |
| P0090 | - 0788 | COMMERCIAL PROPERTY CONDITIONS |
| P0297 | - 0296 | TENNESSEE CHANGES - CANCELLATION AND NONRENEWAL |
| P1030 | - 0402 | CAUSES 0F LOSS - SPECIAL FORM |
| P1556 | - 0297 | BUS. INCOME CHGS.-BEGINNING OF PERIOD OF RESTORATION |
| 0250 | - 0702 | TN CHANGES - CANCELLATION AND NONRENEWAL |
| -8 | - 1094 | ADDITIONAL INTERESTS SCHEDULE |

Includes copyrighted material of Insurance Services Office, Inc. with its permission. Copyright, Insurance Services Office, Inc. 1982,1983, 1984, 1985.

Date Issued: 05/04/2004

**DEFENDANT'S COPY**

# BUILDING AND PERSONAL PROPERTY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we", "us" and "our" refer to the Company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section **H. – Definitions.**

## A. Coverage

We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss.

### 1. Covered Property

Covered Property, as used in this Coverage Part, means the type of property described in this Section, **A.1.,** and limited in **A.2.,** Property Not Covered, if a Limit of Insurance is shown in the Declarations for that type of property.

   a. **Building,** meaning the building or structure described in the Declarations, including:

   (1) Completed additions;

   (2) Fixtures, including outdoor fixtures;

   (3) Permanently installed:

      (a) Machinery and

      (b) Equipment;

   (4) Personal property owned by you that is used to maintain or service the building or structure or its premises, including:

      (a) Fire extinguishing equipment;

      (b) Outdoor furniture;

      (c) Floor coverings; and

      (d) Appliances used for refrigerating, ventilating, cooking, dishwashing or laundering;

   (5) If not covered by other insurance:

      (a) Additions under construction, alterations and repairs to the building or structure;

      (b) Materials, equipment, supplies and temporary structures, on or within 100 feet of the described premises, used for making additions, alterations or repairs to the building or structure.

   b. **Your Business Personal Property** located in or on the building described in the Declarations or in the open (or in a vehicle) within 100 feet of the described premises, consisting of the following unless otherwise specified in the Declarations or on the Your Business Personal Property – Separation of Coverage form:

   (1) Furniture and fixtures;

   (2) Machinery and equipment;

   (3) "Stock";

   (4) All other personal property owned by you and used in your business;

   (5) Labor, materials or services furnished or arranged by you on personal property of others;

   (6) Your use interest as tenant in improvements and betterments. Improvements and betterments are fixtures, alterations, installations or additions:

      (a) Made a part of the building or structure you occupy but do not own; and

      (b) You acquired or made at your expense but cannot legally remove;

DEFENDANT'S COPY

© ISO Properties, Inc., 2001

(7) Leased personal property for which you have a contractual responsibility to insure, unless otherwise provided for under Personal Property of Others.

c. **Personal Property Of Others** that is:

(1) In your care, custody or control; and

(2) Located in or on the building described in the Declarations or in the open (or in a vehicle) within 100 feet of the described premises.

However, our payment for loss of or damage to personal property of others will only be for the account of the owner of the property.

2. **Property Not Covered**

Covered Property does not include:

a. Accounts, bills, currency, food stamps or other evidences of debt, money, notes or securities. Lottery tickets held for sale are not securities;

b. Animals, unless owned by others and boarded by you, or if owned by you, only as "stock" while inside of buildings;

c. Automobiles held for sale;

d. Bridges, roadways, walks, patios or other paved surfaces;

e. Contraband, or property in the course of illegal transportation or trade;

f. The cost of excavations, grading, backfilling or filling;

g. Foundations of buildings, structures, machinery or boilers if their foundations are below:

(1) The lowest basement floor; or

(2) The surface of the ground, if there is no basement;

h. Land (including land on which the property is located), water, growing crops or lawns;

i. Personal property while airborne or waterborne;

j. Bulkheads, pilings, piers, wharves or docks;

k. Property that is covered under another coverage form of this or any other policy in which it is more specifically described, except for the excess of the amount due (whether you can collect on it or not) from that other insurance;

l. Retaining walls that are not part of a building;

m. Underground pipes, flues or drains;

n. Electronic data, except as provided under Additional Coverages – Electronic Data. Electronic data means information, facts or computer programs stored as or on, created or used on, or transmitted to or from computer software (including systems and applications software), on hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other repositories of computer software which are used with electronically controlled equipment. The term computer programs, referred to in the foregoing description of electronic data, means a set of related electronic instructions which direct the operations and functions of a computer or device connected to it, which enable the computer or device to receive, process, store, retrieve or send data. This Paragraph n., does not apply to your "stock" of prepackaged software.

o. The cost to replace or restore the information on valuable papers and records, including those which exist as electronic data. Valuable papers and records include but are not limited to proprietary information, books of account, deeds, manuscripts, abstracts, drawings and card index systems. Refer to the Coverage Extension for Valuable Papers And Records (Other Than Electronic Data) for limited coverage for valuable papers and records other than those which exist as electronic data.

p. Vehicles or self-propelled machines (including aircraft or watercraft) that:

(1) Are licensed for use on public roads; or

DEFENDANT'S COPY

(2) Are operated principally away from the described premises.

This paragraph does not apply to:

  (a) Vehicles or self-propelled machines or autos you manufacture, process or warehouse;

  (b) Vehicles or self-propelled machines, other than autos, you hold for sale;

  (c) Rowboats or canoes out of water at the described premises; or

  (d) Trailers, but only to the extent provided for in the Coverage Extension for Non-Owned Detached Trailers.

q. The following property while outside of buildings:

  (1) Grain, hay, straw or other crops;

  (2) Fences, radio or television antennas (including satellite dishes) and their lead-in wiring, masts or towers, signs (other than signs attached to buildings), trees, shrubs or plants (other than "stock" of trees, shrubs or plants), all except as provided in the Coverage Extensions.

**3. Covered Causes Of Loss**

See applicable Causes of Loss Form as shown in the Declarations.

**4. Additional Coverages**

  **a. Debris Removal**

    (1) Subject to Paragraphs (3) and (4), we will pay your expense to remove debris of Covered Property caused by or resulting from a Covered Cause of Loss that occurs during the policy period. The expenses will be paid only if they are reported to us in writing within 180 days of the date of direct physical loss or damage.

    (2) Debris Removal does not apply to costs to:

      (a) Extract "pollutants" from land or water; or

      (b) Remove, restore or replace polluted land or water.

    (3) Subject to the exceptions in Paragraph (4), the following provisions apply:

      (a) The most we will pay for the total of direct physical loss or damage plus debris removal expense is the Limit of Insurance applicable to the Covered Property that has sustained loss or damage.

      (b) Subject to (a) above, the amount we will pay for debris removal expense is limited to 25% of the sum of the deductible plus the amount that we pay for direct physical loss or damage to the Covered Property that has sustained loss or damage.

    (4) We will pay up to an additional $10,000 for debris removal expense, for each location, in any one occurrence of physical loss or damage to Covered Property, if one or both of the following circumstances apply:

      (a) The total of the actual debris removal expense plus the amount we pay for direct physical loss or damage exceeds the Limit of Insurance on the Covered Property that has sustained loss or damage.

      (b) The actual debris removal expense exceeds 25% of the sum of the deductible plus the amount that we pay for direct physical loss or damage to the Covered Property that has sustained loss or damage.

Therefore, if (4)(a) and/or (4)(b) apply, our total payment for direct physical loss or damage and debris removal expense may reach but will never exceed the Limit of Insurance on the Covered Property that has sustained loss or damage, plus $10,000.

DEFENDANT'S COPY

© ISO Properties, Inc., 2001

**(3)** The most we will pay for loss or damage under this Extension is $5,000, unless a higher limit is shown in the Declarations.

**(4)** This insurance is excess over the amount due (whether you can collect on it or not) from any other insurance covering such property.

Each of these Extensions is additional insurance unless otherwise indicated. The Additional Condition, Coinsurance, does not apply to these Extensions.

## B. Exclusions And Limitations

See applicable Causes of Loss Form as shown in the Declarations.

## C. Limits Of Insurance

The most we will pay for loss or damage in any one occurrence is the applicable Limit of Insurance shown in the Declarations.

The most we will pay for loss or damage to outdoor signs attached to buildings is $1,000 per sign in any one occurrence.

The limits applicable to the Fire Department Service Charge and Pollutant Clean Up and Removal Additional Coverages are in addition to the Limits of Insurance.

Payments under the Preservation of Property Additional Coverage will not increase the applicable Limit of Insurance.

## D. Deductible

In any one occurrence of loss or damage (hereinafter referred to as loss), we will first reduce the amount of loss if required by the Coinsurance Condition or the Agreed Value Optional Coverage. If the adjusted amount of loss is less than or equal to the Deductible, we will not pay for that loss. If the adjusted amount of loss exceeds the Deductible, we will then subtract the Deductible from the adjusted amount of loss, and will pay the resulting amount or the Limit of Insurance, whichever is less.

When the occurrence involves loss to more than one item of Covered Property and separate Limits of Insurance apply, the losses will not be combined in determining application of the Deductible. But the Deductible will be applied only once per occurrence.

**Example No. 1:**

(This example assumes there is no coinsurance penalty.)

| | |
|---|---|
| Deductible: | $   250 |
| Limit of Insurance – Bldg. 1: | $ 60,000 |
| Limit of Insurance – Bldg. 2: | $ 80,000 |
| Loss to Bldg. 1: | $ 60,100 |
| Loss to Bldg. 2: | $ 90,000 |

The amount of loss to Bldg. 1 ($60,100) is less than the sum ($60,250) of the Limit of Insurance applicable to Bldg. 1 plus the Deductible.

The Deductible will be subtracted from the amount of loss in calculating the loss payable for Bldg. 1:

$ 60,100

– 250

$ 59,850 Loss Payable – Bldg. 1

The Deductible applies once per occurrence and therefore is not subtracted in determining the amount of loss payable for Bldg. 2. Loss payable for Bldg. 2 is the Limit of Insurance of $80,000.

Total amount of loss payable: $59,850 + 80,000 = $139, 850

DEFENDANT'S COPY

**Example No. 2:**

(This example, too, assumes there is no coinsurance penalty.)

The Deductible and Limits of Insurance are the same as those in Example No. 1.

Loss to Bldg. 1:  $   70,000

(exceeds Limit of Insurance plus Deductible)

Loss to Bldg. 2:  $   90,000

(exceeds Limit of Insurance plus Deductible)

Loss Payable – Bldg. 1:   $60,000

(Limit of Insurance)

Loss Payable – Bldg. 2:   $80,000

(Limit of Insurance)

Total amount of loss payable:

$140,000

## E. Loss Conditions

The following conditions apply in addition to the Common Policy Conditions and the Commercial Property Conditions.

### 1. Abandonment

There can be no abandonment of any property to us.

### 2. Appraisal

If we and you disagree on the value of the property or the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser. The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the value of the property and amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

**a.** Pay its chosen appraiser; and

**b.** Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal, we will still retain our right to deny the claim.

### 3. Duties In The Event Of Loss Or Damage

**a.** You must see that the following are done in the event of loss or damage to Covered Property:

(1) Notify the police if a law may have been broken.

(2) Give us prompt notice of the loss or damage. Include a description of the property involved.

(3) As soon as possible, give us a description of how, when and where the loss or damage occurred.

(4) Take all reasonable steps to protect the Covered Property from further damage, and keep a record of your expenses necessary to protect the Covered Property, for consideration in the settlement of the claim. This will not increase the Limit of Insurance. However, we will not pay for any subsequent loss or damage resulting from a cause of loss that is not a Covered Cause of Loss. Also, if feasible, set the damaged property aside and in the best possible order for examination.

(5) At our request, give us complete inventories of the damaged and undamaged property. Include quantities, costs, values and amount of loss claimed.

(6) As often as may be reasonably required, permit us to inspect the property proving the loss or damage and examine your books and records.

Also permit us to take samples of damaged and undamaged property for inspection, testing and analysis, and permit us to make copies from your books and records.

(7) Send us a signed, sworn proof of loss containing the information we request to investigate the claim. You must do this within 60 days after our request. We will supply you with the necessary forms.

(8) Cooperate with us in the investigation or settlement of the claim.

b. We may examine any insured under oath, while not in the presence of any other insured and at such times as may be reasonably required, about any matter relating to this insurance or the claim, including an insured's books and records. In the event of an examination, an insured's answers must be signed.

4. **Loss Payment**

a. In the event of loss or damage covered by this Coverage Form, at our option, we will either:

(1) Pay the value of lost or damaged property;

(2) Pay the cost of repairing or replacing the lost or damaged property, subject to b. below;

(3) Take all or any part of the property at an agreed or appraised value; or

(4) Repair, rebuild or replace the property with other property of like kind and quality, subject to b. below.

We will determine the value of lost or damaged property, or the cost of its repair or replacement, in accordance with the applicable terms of the Valuation Condition in this Coverage Form or any applicable provision which amends or supersedes the Valuation Condition.

b. The cost to repair, rebuild or replace does not include the increased cost attributable to enforcement of any ordinance or law regulating the construction, use or repair of any property.

c. We will give notice of our intentions within 30 days after we receive the sworn proof of loss.

d. We will not pay you more than your financial interest in the Covered Property.

e. We may adjust losses with the owners of lost or damaged property if other than you. If we pay the owners, such payments will satisfy your claims against us for the owners' property. We will not pay the owners more than their financial interest in the Covered Property.

f. We may elect to defend you against suits arising from claims of owners of property. We will do this at our expense.

g. We will pay for covered loss or damage within 30 days after we receive the sworn proof of loss, if you have complied with all of the terms of this Coverage Part and:

(1) We have reached agreement with you on the amount of loss; or

(2) An appraisal award has been made.

5. **Recovered Property**

If either you or we recover any property after loss settlement, that party must give the other prompt notice. At your option, the property will be returned to you. You must then return to us the amount we paid to you for the property. We will pay recovery expenses and the expenses to repair the recovered property, subject to the Limit of Insurance.

6. **Vacancy**

a. **Description Of Terms**

(1) As used in this Vacancy Condition, the term building and the term vacant have the meanings set forth in (1)(a) and (1)(b) below:

(a) When this policy is issued to a tenant, and with respect to that tenant's interest in Covered Property, building means the unit or suite rented or leased to the tenant. Such building is vacant when it does not contain enough business personal property to conduct customary operations.

(b) When this policy is issued to the owner or general lessee of a building, building means the entire building. Such building is vacant unless at least 31% of its total square footage is:

(i) Rented to a lessee or sub-lessee and used by the lessee or sub-lessee to conduct its customary operations; and/or

(ii) Used by the building owner to conduct customary operations.

DEFENDANT'S COPY

©ISO Properties, Inc. 2001

(2) Buildings under construction or renovation are not considered vacant.

b. **Vacancy Provisions**

If the building where loss or damage occurs has been vacant for more than 60 consecutive days before that loss or damage occurs:

(1) We will not pay for any loss or damage caused by any of the following even if they are Covered Causes of Loss:

(a) Vandalism;

(b) Sprinkler leakage, unless you have protected the system against freezing;

(c) Building glass breakage;

(d) Water damage;

(e) Theft; or

(f) Attempted theft.

(2) With respect to Covered Causes of Loss other than those listed in **b.(1)(a)** through **b.(1)(f)** above, we will reduce the amount we would otherwise pay for the loss or damage by 15%.

**7. Valuation**

We will determine the value of Covered Property in the event of loss or damage as follows:

a. At actual cash value as of the time of loss or damage, except as provided in **b., c., d.** and **e.** below.

b. If the Limit of Insurance for Building satisfies the Additional Condition, Coinsurance, and the cost to repair or replace the damaged building property is $2,500 or less, we will pay the cost of building repairs or replacement.

The cost of building repairs or replacement does not include the increased cost attributable to enforcement of any ordinance or law regulating the construction, use or repair of any property. However, the following property will be valued at the actual cash value even when attached to the building:

(1) Awnings or floor coverings;

(2) Appliances for refrigerating, ventilating, cooking, dishwashing or laundering; or

(3) Outdoor equipment or furniture.

c. "Stock" you have sold but not delivered at the selling price less discounts and expenses you otherwise would have had.

d. Glass at the cost of replacement with safety glazing material if required by law.

e. Tenant's Improvements and Betterments at:

(1) Actual cash value of the lost or damaged property if you make repairs promptly.

(2) A proportion of your original cost if you do not make repairs promptly. We will determine the proportionate value as follows:

(a) Multiply the original cost by the number of days from the loss or damage to the expiration of the lease; and

(b) Divide the amount determined in (a) above by the number of days from the installation of improvements to the expiration of the lease.

If your lease contains a renewal option, the expiration of the renewal option period will replace the expiration of the lease in this procedure.

(3) Nothing if others pay for repairs or replacement.

**DEFENDANT'S COPY**

**F. Additional Conditions**

The following conditions apply in addition to the Common Policy Conditions and the Commercial Property Conditions.

**1. Coinsurance**

If a Coinsurance percentage is shown in the Declarations, the following condition applies.

a. We will not pay the full amount of any loss if the value of Covered Property at the time of loss times the Coinsurance percentage shown for it in the Declarations is greater than the Limit of Insurance for the property.

Instead, we will determine the most we will pay using the following steps:

(1) Multiply the value of Covered Property at the time of loss by the Coinsurance percentage;

(2) Divide the Limit of Insurance of the property by the figure determined in Step (1);

(3) Multiply the total amount of loss, before the application of any deductible, by the figure determined in Step (2); and

(4) Subtract the deductible from the figure determined in Step (3).

We will pay the amount determined in Step (4) or the limit of insurance, whichever is less. For the remainder, you will either have to rely on other insurance or absorb the loss yourself.

**Example No. 1 (Underinsurance):**

| When: | | |
|---|---|---|
| The value of the property is | $ | 250,000 |
| The Coinsurance percentage for it is | | 80% |
| The Limit of Insurance for it is | $ | 100,000 |
| The Deductible is | $ | 250 |
| The amount of loss is | $ | 40,000 |

Step (1): $250,000 x 80% = $200,000

(the minimum amount of insurance to meet your Coinsurance requirements)

Step (2): $100,000 / $200,000 = .50

Step (3): $40,000 x .50 = $20,000

Step (4): $20,000 -- $250 = $19,750

We will pay no more than $19,750. The remaining $20,250 is not covered.

**Example No. 2 (Adequate Insurance):**

| When: | | |
|---|---|---|
| The value of the property is | $ | 250,000 |
| The Coinsurance percentage for it is | | 80% |
| The Limit of Insurance for it is | $ | 200,000 |
| The Deductible is | $ | 250 |
| The amount of loss is | $ | 40,000 |

The minimum amount of insurance to meet your Coinsurance requirement is $200,000 ($250,000 x 80%). Therefore, the Limit of Insurance in this Example is adequate and no penalty applies. We will pay no more than $39,750 ($40,000 amount of loss minus the deductible of $250).

b. If one Limit of Insurance applies to two or more separate items, this condition will apply to the total of all property to which the limit applies.

DEFENDANT'S COPY

© ISO Properties, Inc. 2001

**Example No. 3:**

When:
    The value of property is:

| | | |
|---|---|---:|
| Bldg. at Location No. 1 | $ | 75,000 |
| Bldg. at Location No. 2 | $ | 100,000 |
| Personal Property at Location No. 2 | $ | 75,000 |
| | $ | 250,000 |
| The Coinsurance percentage for it is | | 90% |
| The Limit of Insurance for Buildings and Personal Property at Location Nos. 1 and 2 is | $ | 180,000 |
| The Deductible is | $ | 1,000 |
| The amount of loss is: | | |
| Bldg. at Location No. 2 | $ | 30,000 |
| Personal Property at Location No. 2. | $ | 20,000 |
| | $ | 50,000 |

Step (1): $250,000 x 90% = $225,000
(the minimum amount of insurance to meet your Coinsurance requirements and to avoid the penalty shown below)

Step (2): $180,000 / $225,000 = .80

Step (3): $50,000 x .80 = $40,000

Step (4): $40,000 – $1,000 = $39,000

We will pay no more than $39,000. The remaining $11,000 is not covered.

**2. Mortgageholders**

a. The term mortgageholder includes trustee.

b. We will pay for covered loss of or damage to buildings or structures to each mortgageholder shown in the Declarations in their order of precedence, as interests may appear.

c. The mortgageholder has the right to receive loss payment even if the mortgageholder has started foreclosure or similar action on the building or structure.

d. If we deny your claim because of your acts or because you have failed to comply with the terms of this Coverage Part, the mortgageholder will still have the right to receive loss payment if the mortgageholder:

(1) Pays any premium due under this Coverage Part at our request if you have failed to do so;

(2) Submits a signed, sworn proof of loss within 60 days after receiving notice from us of your failure to do so; and

(3) Has notified us of any change in ownership, occupancy or substantial change in risk known to the mortgageholder.

All of the terms of this Coverage Part will then apply directly to the mortgageholder.

e. If we pay the mortgageholder for any loss or damage and deny payment to you because of your acts or because you have failed to comply with the terms of this Coverage Part:

(1) The mortgageholder's rights under the mortgage will be transferred to us to the extent of the amount we pay; and

(2) The mortgageholder's right to recover the full amount of the mortgageholder's claim will not be impaired.

At our option, we may pay to the mortgageholder the whole principal on the mortgage plus any accrued interest. In this event, your mortgage and note will be transferred to us and you will pay your remaining mortgage debt to us.

f. If we cancel this policy, we will give written notice to the mortgageholder at least:

(1) 10 days before the effective date of cancellation if we cancel for your nonpayment of premium; or

(2) 30 days before the effective date of cancellation if we cancel for any other reason.

g. If we elect not to renew this policy, we will give written notice to the mortgageholder at least 10 days before the expiration date of this policy. **DEFENDANT'S COPY**

© ISO Properties, Inc., 2001

### G. Optional Coverages

If shown as applicable in the Declarations, the following Optional Coverages apply separately to each Item.

1. **Agreed Value**

   a. The Additional Condition, Coinsurance, does not apply to Covered Property to which this Optional Coverage applies. We will pay no more for loss of or damage to that property than the proportion that the Limit of Insurance under this Coverage Part for the property bears to the Agreed Value shown for it in the Declarations.

   b. If the expiration date for this Optional Coverage shown in the Declarations is not extended, the Additional Condition, Coinsurance, is reinstated and this Optional Coverage expires.

   c. The terms of this Optional Coverage apply only to loss or damage that occurs:

      (1) On or after the effective date of this Optional Coverage; and

      (2) Before the Agreed Value expiration date shown in the Declarations or the policy expiration date, whichever occurs first.

2. **Inflation Guard**

   a. The Limit of Insurance for property to which this Optional Coverage applied will automatically increase by the annual percentage shown in the Declarations.

   b. The amount of increase will be:

      (1) The Limit of Insurance that applied on the most recent of the policy inception date, the policy anniversary date, or any other policy change amending the Limit of Insurance, times

      (2) The percentage of annual increase shown in the Declarations, expressed as a decimal (example: 8% is .08), times

      (3) The number of days since the beginning of the current policy year or the effective date of the most recent policy change amending the Limit of Insurance, divided by 365.

**Example:**

| If: | | |
|---|---|---|
| The applicable Limit of Insurance is | $ | 100,000 |
| The annual percentage increase is | | 8% |
| The number of days since the beginning of the policy year (or last policy change) is | | 146 |
| The amount of increase is $100,000 x .08 x 146 / 365 = | $ | 3,200 |

3. **Replacement Cost**

   a. Replacement Cost (without deduction for depreciation) replaces Actual Cash Value in the Loss Condition, Valuation, of this Coverage Form.

   b. This Optional Coverage does not apply to:

      (1) Personal property of others;

      (2) Contents of a residence;

      (3) Works of art, antiques or rare articles, including etchings, pictures, statuary, marbles, bronzes, porcelains and bric-a-brac; or

      (4) "Stock", unless the including "Stock" option is shown in the Declarations.

      Under the terms of this Replacement Cost Optional Coverage, tenants' improvements and betterments are not considered to be the personal property of others.

   c. You may make a claim for loss or damage covered by this insurance on an actual cash value basis instead of on a replacement cost basis. In the event you elect to have loss or damage settled on an actual cash value basis, you may still make a claim for the additional coverage this Optional Coverage provides if you notify us of your intent to do so within 180 days after the loss or damage.

DEFENDANT'S COPY

© ISO Properties, Inc., 2001

    **d.** We will not pay on a replacement cost basis for any loss or damage:

       (1) Until the lost or damaged property is actually repaired or replaced; and

       (2) Unless the repairs or replacement are made as soon as reasonably possible after the loss or damage.

      With respect to tenants' improvements and betterments, the following also apply:

       (3) If the conditions in **d.(1)** and **d.(2)** above are not met, the value of tenants' improvements and betterments will be determined as a proportion of your original cost, as set forth in the Valuation Condition of this Coverage Form; and

       (4) We will not pay for loss or damage to tenants' improvements and betterments if others pay for repairs or replacement.

    **e.** We will not pay more for loss or damage on a replacement cost basis than the least of **(1)**, **(2)** or **(3)**, subject to **f.** below:

       (1) The Limit of Insurance applicable to the lost or damaged property;

       (2) The cost to replace the lost or damaged property with other property:

         (a) Of comparable material and quality; and

         (b) Used for the same purpose; or

       (3) The amount actually spent that is necessary to repair or replace the lost or damaged property.

      If a building is rebuilt at a new premises, the cost described in **e.(2)** above is limited to the cost which would have been incurred if the building had been rebuilt at the original premises.

    **f.** The cost of repair or replacement does not include the increased cost attributable to enforcement of any ordinance or law regulating the construction, use or repair of any property.

  **4. Extension Of Replacement Cost To Personal Property Of Others**

    **a.** If the Replacement Cost Optional Coverage is shown as applicable in the Declarations, then this Extension may also be shown as applicable. If the Declarations show this Extension as applicable, then Paragraph **3.b.(1)** of the Replacement Cost Optional Coverage is deleted and all other provisions of the Replacement Cost Optional Coverage apply to replacement cost on personal property of others.

    **b.** With respect to replacement cost on the personal property of others, the following limitation applies:

      If an item(s) of personal property of others is subject to a written contract which governs your liability for loss or damage to that item(s), then valuation of that item(s) will be based on the amount for which you are liable under such contract, but not to exceed the lesser of the replacement cost of the property or the applicable Limit of Insurance.

**H. Definitions**

  **1.** "Fungus" means any type or form of fungus, including mold or mildew, and any mycotoxins, spores, scents or by-products produced or released by fungi.

  **2.** "Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

  **3.** "Stock" means merchandise held in storage or for sale, raw materials and in-process or finished goods, including supplies used in their packing or shipping.

DEFENDANT'S COPY

© ISO Properties, Inc., 2001

# BUSINESS INCOME (AND EXTRA EXPENSE) COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we", "us" and "our" refer to the Company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section **G. – Definitions.**

## A. Coverage

### 1. Business Income

Business Income means the:

**a.** Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred; and

**b.** Continuing normal operating expenses incurred, including payroll.

For manufacturing risks, Net Income includes the net sales value of production.

Coverage is provided as described and limited below for one or more of the following options for which a Limit of Insurance is shown in the Declarations:

**a.** Business Income including "Rental Value".

**b.** Business Income other than "Rental Value".

**c.** "Rental Value".

If option **a.** above is selected, the term Business Income will include "Rental Value". If option **c.** above is selected, the term Business Income will mean "Rental Value" only.

If Limits of Insurance are shown under more than one of the above options, the provisions of this Coverage Part apply separately to each.

We will pay for the actual loss of Business Income you sustain due to the necessary "suspension" of your "operations" during the "period of restoration". The "suspension" must be caused by direct physical loss of or damage to property at premises which are described in the Declarations and for which a Business Income Limit of Insurance is shown in the Declarations. The loss or damage must be caused by or result from a Covered Cause of Loss. With respect to loss of or damage to personal property in the open or personal property in a vehicle, the described premises include the area within 100 feet of the site at which the described premises are located.

With respect to the requirements set forth in the preceding paragraph, if you occupy only part of the site at which the described premises are located, your premises means:

**a.** The portion of the building which you rent, lease or occupy; and

**b.** Any area within the building or on the site at which the described premises are located, if that area services, or is used to gain access to, the described premises.

### 2. Extra Expense

**a.** Extra Expense coverage is provided at the premises described in the Declarations only if the Declarations show that Business Income coverage applies at that premises.

**b.** Extra Expense means necessary expenses you incur during the "period of restoration" that you would not have incurred if there had been no direct physical loss or damage to property caused by or resulting from a Covered Cause of Loss.

We will pay Extra Expense (other than the expense to repair or replace property) to:

**(1)** Avoid or minimize the "suspension" of business and to continue operations at the described premises or at replacement premises or temporary locations, including relocation expenses and costs to equip and operate the replacement location or temporary location.

**(2)** Minimize the "suspension" of business if you cannot continue "operations".

We will also pay Extra Expense to repair or replace property, but only to the extent it reduces the amount of loss that otherwise would have been payable under this Coverage Form.

DEFENDANT'S COPY

© ISO Properties, Inc., 2001

(4) The most we will pay under this Additional Coverage – Interruption of Computer Operations is $2,500 for all loss sustained and expense incurred in any one policy year, regardless of the number of interruptions or the number of premises, locations or computer systems involved. If loss payment relating to the first interruption does not exhaust this amount, then the balance is available for loss or expense sustained or incurred as a result of subsequent interruptions in that policy year. A balance remaining at the end of a policy year does not increase the amount of insurance in the next policy year. With respect to any interruption which begins in one policy year and continues or results in additional loss or expense in a subsequent policy year(s), all loss and expense is deemed to be sustained or incurred in the policy year in which the interruption began.

(5) This Additional Coverage – Interruption in Computer Operations does not apply to loss sustained or expense incurred after the end of the "period of restoration", even if the amount of insurance stated in (4) above has not been exhausted.

## 6. Coverage Extension

If a Coinsurance percentage of 50% or more is shown in the Declarations, you may extend the insurance provided by this Coverage Part as follows:

### Newly Acquired Locations

a. You may extend your Business Income and Extra Expense Coverages to apply to property at any location you acquire other than fairs or exhibitions.

b. The most we will pay under this Extension, for the sum of Business Income loss and Extra Expense incurred, is $100,000 at each location.

c. Insurance under this Extension for each newly acquired location will end when any of the following first occurs:

(1) This policy expires;

(2) 30 days expire after you acquire or begin to construct the property; or

(3) You report values to us.

We will charge you additional premium for values reported from the date you acquire the property.

This Extension is additional insurance. The Additional Condition, Coinsurance, does not apply to this Extension.

## B. Limits Of Insurance

The most we will pay for loss in any one occurrence is the applicable Limit of Insurance shown in the Declarations.

The limit applicable to the Coverage Extension is in addition to the Limit of Insurance.

Payments under the following coverages will not increase the applicable Limit of Insurance:

1. Alterations and New Buildings;
2. Civil Authority;
3. Extra Expense; or
4. Extended Business Income.

## C. Loss Conditions

The following conditions apply in addition to the Common Policy Conditions and the Commercial Property Conditions.

### 1. Appraisal

If we and you disagree on the amount of Net Income and operating expense or the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser.

The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the amount of Net Income and operating expense or amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

a. Pay its chosen appraiser; and

b. Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal, we will still retain our right to deny the claim.

**DEFENDANT'S COPY**

©ISO Properties, Inc., 2001

2. **Duties In The Event Of Loss**

   a. You must see that the following are done in the event of loss:

   (1) Notify the police if a law may have been broken.

   (2) Give us prompt notice of the direct physical loss or damage. Include a description of the property involved.

   (3) As soon as possible, give us a description of how, when, and where the direct physical loss or damage occurred.

   (4) Take all reasonable steps to protect the Covered Property from further damage, and keep a record of your expenses necessary to protect the Covered Property, for consideration in the settlement of the claim. This will not increase the Limit of Insurance. However, we will not pay for any subsequent loss or damage resulting from a cause of loss that is not a Covered Cause of Loss. Also, if feasible, set the damaged property aside and in the best possible order for examination.

   (5) As often as may be reasonably required, permit us to inspect the property proving the loss or damage and examine your books and records.

   Also permit us to take samples of damaged and undamaged property for inspection, testing and analysis, and permit us to make copies from your books and records.

   (6) Send us a signed, sworn proof of loss containing the information we request to investigate the claim. You must do this within 60 days after our request. We will supply you with the necessary forms.

   (7) Cooperate with us in the investigation or settlement of the claim.

   (8) If you intend to continue your business, you must resume all or part of your "operations" as quickly as possible.

   b. We may examine any insured under oath, while not in the presence of any other insured and at such times as may be reasonably required, about any matter relating to this insurance or the claim, including an insured's books and records. In the event of an examination, an insured's answers must be signed.

3. **Loss Determination**

   a. The amount of Business Income loss will be determined based on:

   (1) The Net Income of the business before the direct physical loss or damage occurred;

   (2) The likely Net Income of the business if no physical loss or damage had occurred, but not including any Net Income that would likely have been earned as a result of an increase in the volume of business due to favorable business conditions caused by the impact of the Covered Cause of Loss on customers or on other businesses;

   (3) The operating expenses, including payroll expenses, necessary to resume "operations" with the same quality of service that existed just before the direct physical loss or damage; and

   (4) Other relevant sources of information, including:

   (a) Your financial records and accounting procedures;

   (b) Bills, invoices and other vouchers; and

   (c) Deeds, liens or contracts.

   b. The amount of Extra Expense will be determined based on:

   (1) All expenses that exceed the normal operating expenses that would have been incurred by "operations" during the "period of restoration" if no direct physical loss or damage had occurred. We will deduct from the total of such expenses:

   (a) The salvage value that remains of any property bought for temporary use during the "period of restoration", once "operations" are resumed; and

   (b) Any Extra Expense that is paid for by other insurance, except for insurance that is written subject to the same plan, terms, conditions and provisions as this insurance; and

   (2) Necessary expenses that reduce the Business Income loss that otherwise would have been incurred.

DEFENDANT'S COPY

© ISO Properties, Inc. 2001

**c. Resumption Of Operations**

We will reduce the amount of your:

(1) Business Income loss, other than Extra Expense, to the extent you can resume your "operations", in whole or in part, by using damaged or undamaged property (including merchandise or stock) at the described premises or elsewhere.

(2) Extra Expense loss to the extent you can return "operations" to normal and discontinue such Extra Expense.

**d.** If you do not resume "operations", or do not resume "operations" as quickly as possible, we will pay based on the length of time it would have taken to resume "operations" as quickly as possible.

**4. Loss Payment**

We will pay for covered loss within 30 days after we receive the sworn proof of loss, if you have complied with all of the terms of this Coverage Part and:

a. We have reached agreement with you on the amount of loss; or

b. An appraisal award has been made.

## D. Additional Condition

*Coinsurance*

If a Coinsurance percentage is shown in the Declarations, the following condition applies in addition to the Common Policy Conditions and the Commercial Property Conditions.

We will not pay the full amount of any Business Income loss if the Limit of Insurance for Business Income is less than:

a. The Coinsurance percentage shown for Business Income in the Declarations; times

b. The sum of:

(1) The Net Income (Net Profit or Loss before income taxes), and

(2) Operating expenses, including payroll expenses,

that would have been earned or incurred (had no loss occurred) by your "operations" at the described premises for the 12 months following the inception, or last previous anniversary date, of this policy (whichever is later).

Instead, we will determine the most we will pay using the following steps:

1. Multiply the Net Income and operating expense for the 12 months following the inception, or last previous anniversary date, of this policy by the Coinsurance percentage;

2. Divide the Limit of Insurance for the described premises by the figure determined in Step 1.; and

3. Multiply the total amount of loss by the figure determined in Step 2.

We will pay the amount determined in Step 3. or the limit of insurance, whichever is less. For the remainder, you will either have to rely on other insurance or absorb the loss yourself.

In determining operating expenses for the purpose of applying the Coinsurance condition, the following expenses, if applicable, shall be deducted from the total of all operating expenses:

1. Prepaid freight – outgoing;

2. Returns and allowances;

3. Discounts;

4. Bad debts;

5. Collection expenses;

6. Cost of raw stock and factory supplies consumed (including transportation charges);

7. Cost of merchandise sold (including transportation charges);

8. Cost of other supplies consumed (including transportation charges);

DEFENDANTS' COPY

Exhibit 2

DEFENDANT'S COPY

DUDLEY W. TAYLOR
dtaylor@taylorlawknox.com

# THE TAYLOR LAW FIRM
P.O. BOX 31705
KNOXVILLE, TENNESSEE 37930-1705
PHONE (865) 539-1067
FAX (865) 539-1551

STREET ADDRESS
110-B PERIMETER PARK RD.
KNOXVILLE, TENNESSEE 37922

January 26, 2007
(Dictated January 25, 2007)

FILE COPY

FAXED

VIA FACSIMILE and US MAIL: 546-0432
Archie R. Carpenter, Esq.
Carpenter, O'Connor & Sterchi, PLLC
P. O. Box 2485
Knoxville, TN 37901

Re:    Riverchase Motel

Dear Archie:

I am following up on the Examination Under Oath today. First, I am hopeful that this matter can be resolved when your client's representatives can meet with Mr. Grantham and review available records, photos and the like. I know that Mr. Grantham would like to resolve this in a reasonable manner and on a good-faith basis, and I am going to presume that your client is taking the same approach. I think that may be easier to do now that some of the earlier obstacles have been removed. I think it worth while to describe some of the obstacles with which we earlier dealt.

Before getting into the earlier problems, I would like to correct one thing that Mr. Grantham said today in response to one of your questions. The issue was whether he had made a claim for replacement value as opposed to actual cash value of the loss. He said, no, and when I asked him about that afterwards, he said that he thought you were referring to a separate and additional proof of loss. We did not submit an additional and separate proof of loss on replacement value, but the request was made in three ways. First, the initial discussions between Mr. Grantham and Mr. Smith involved that concept, at least from the standpoint of Mr. Grantham. Second, the sworn proof of loss which we filed was based on replacement value.  Third, I sent out a number of letters to your client's representatives addressing this issue among others.

This leads me to the problems to which I alluded earlier. One of these problems was the issue of replacement loss. The first issue with which I had to deal was the question of co-insurance as to the property loss. Mr. Jones insisted that co-insurance was applicable, but he was basing that on a comparison of the coverage with the replacement

DEFENDANT'S COPY

value of the facility. I wrote to him on two or three occasions reciting policy language, making it clear that whether or not co-insurance would be applicable was to be determined on the basis of the actual value of the insured property.

In what was a very frustrating matter for me, Mr. Jones then proposed that the insurer would pay only the actual cash value of the loss rather than replacement value. I again recited for him the provision of the Policy reflecting the endorsement for replacement coverage. I wrote first to Mr. Smith and then later to Mr. DeCesare, attempting to clear up this point. Despite several letters, I never received a single acknowledgement that we were correct that first, co-insurance would be based only on actual cash value of the property as compared to the coverage in place and second, that the replacement coverage endorsement was in place.

There were a number of other missteps along the way. This is why the repairs have not been completed to date. Mr. Grantham was first led to believe that a settlement would be made based on the estimated cost to replace and restore from the fire damage. Although I obviously do not have the experience that you do in dealing with these matters, I know that most claims are settled on that basis.

There was also the question of whether an appraisal would be taken. I was informed in a letter from Mr. Smith dated December 19, 2005, and I will **enclose** a copy for your convenience, that an appraiser had been retained to appraise the property. In the spring and early summer of the following year, I was contacted by appraiser Ken Woodford who had been retained to complete that appraisal. I had brief conversations with Woodford on two or more occasions after that, simply inquiring as to when he would have the process completed. We obviously did not discuss any details of the appraisal. To date, I have not seen any result of that appraisal. Since the insurance company apparently paid for it, I suspect that the appraisal supports the damage claim submitted by Mr. Grantham.

I pulled a number of letters, but I will not burden you with copies of all of them. I will **enclose** a copy of my letter of May 25, 2006, where I attempted to summarize these issues. Please forgive the unfriendly tenor of that letter, but I was exceedingly upset by that time over what I felt to be a lack of professionalism on the part of the representatives of your client. I do not make this assertion to argue that point with you, but only to ask that you understand where I was coming from at that time.

I will also **enclose** a "sequence of events" as seen from our perspective. I put that together at a time when I thought there was going to be no possibility of resolving this or indeed, to receive any further consideration from the insurer.

One last point had to do with the failure to return telephone calls. That is what Mr. Grantham told me when we first met and before he even answered your question on that point, it was my recollection that he had left at least 10 calls that had not been

DEFENDANT'S COPY

returned. I also had this confirmed by the local agent, or more precisely, the local agent confirmed to me that he also had difficulty in getting a response from Mr. Smith.

Again, Archie, I do not raise this point to harm the working relationship, but only to point out the problems that we earlier encountered, at least from our perception. Having said all of that, I will count on the good faith and reasonable attitude of the parties to allow a settlement to promptly be reached without the need to resort further to the lawyers.

With kind regards, I remain

Sincerely yours,

Dudley W. Taylor

DWT/ck 15.02005
Carpenter.1.26.07
Enclosures
cc:     Client (via fax)
        Christy Ransone

DEFENDANT'S COPY

DUDLEY W. TAYLOR
dtaylor@taylorlawknox.com

THE TAYLOR LAW FIRM

P.O. BOX 31705

KNOXVILLE, TENNESSEE 37930-1705

PHONE (865) 539-1067

FAX (865) 539-1551

STREET ADDRESS
110-B PERIMETER PARK RD.
KNOXVILLE, TENNESSEE 37922

May 25, 2006

**FILE COPY**

**FAXED**

<u>VIA FACSIMILE: 502-348-7030</u>
Anthony DeCesare, Sr. Claims Analyst
Indiana Insurance
P. O. Box 458
Bardstown, KY 40004

Re: Riverchase Motel

Dear Mr. DeCesare:

I have delayed in responding to your letter of May 8 and 9, 2006, in an effort to provide a more moderate response than you would have received had I responded immediately. I also took that time to put together a chronology of events and I will **enclose** a copy with this letter. I am also willing to accept the fact that your letter of May 8, 2006 in which you proposed that we meet on certain days in March, was inadvertent and not further effort to create confusion. Nonetheless, the fact remains that you and your predecessor have very carefully and deliberately avoided responding to any of our questions and the concerns raised by the insured and by me. I also am absolutely convinced that your actions reflect bad faith on the part of the insurer and my summary of these actions are set out hereafter:

1. Smith insisted that the determination of whether coinsurance was applicable would be based on replacement cost rather than actual value at the time of loss. However, the policy language only refers to value and not replacement cost. I have brought this up in each and every letter, to the extent that I sound like a broken record and yet there has never been a meaningful response by anyone.

2. Although Smith insisted on using replacement cost for penalizing the insured with the coinsurance factor, he asserted that the determination of loss would be based only on actual value at the time of loss, rather than replacement cost. This position was taken despite the fact that the policy indicates an endorsement for replacement cost. Although Anderson, the vice president of the insurer, subsequently confirmed this, Smith never agreed to the point or even responded to it.

3. Although I recited pertinent policy language for Smith and even provided him with copies of the pages at issue supporting our position on the above two points, he continued to avoid the subject. Moreover, he admitted on at least 2 occasions that he was not familiar with that language. In short, if he is to be believed, he did not even have the policy, or at least all parts of it, available to him when he attempted to adjust this loss.

4. Smith asserted soon after I got involved in this that he was obtaining an independent property appraisal. This assertion was made several times over a period of 4 or 5 weeks. Yet, nothing has ever come of it and now DeCesare makes no mention of

DEFENDANT'S COPY

this. What happened to this appraisal? Was it undertaken and the results not favorable to the insurer?

5.  Smith repeatedly requested a "face to face meeting". DeCesare picked up with this request once he became involved. Yet, once we agreed and attempted to arrange a meeting, DeCesare backed away and is now insisting that he will not meet unless we jump through several hoops before hand.

6.  Smith and DeCesare have been critical of the insured's failure to provide a sworn proof of loss and yet they did not even provide their form (which the insured is required under the policy to use), until more than 8 months after the fire. They now insist on all kinds of documentation although there is no reference to that documentation on the form.

7.  The adjusters cannot write coherent letters. I agree this is a bit outside the usual definition of bad faith, but it is difficult to read these letters without suspecting that each of them deliberately utilized incoherent language in an effort to avoid having to face the issues.

The situation would be humorous if it was not so critical for the insured. It really has been a Keystone Kops experience with you and Mr. Smith. Of course, you introduced the added element, surely without being aware of the irony of such declarations that your company "has and will continue to require strict adherence to all policy of [sic] insurance terms and conditions." The whole point of my many exchanges with Mr. Smith and later you was to point out that your adjusting positions were <u>not</u> consistent with the policy language.

Of course, we also find ourselves in the ironic position of having finally agreed to the many requests by first Mr. Smith and then you, that we meet "face to face" and then to have you reverse field once we agree. Surely you cannot review the correspondence exchanged since December of last year and not feel some sense of embarrassment.

I have recommended two alternative courses to my client. I will let you know as soon as he chooses one or the other, or opts for yet a different course of action. In the mean time, we **"have and will continue to require strict adherence to all policy terms and conditions." Further, any correspondence which we may send to you does not constitute a waiver of any of the rights to which the insured is entitled under the policy issued by your company.**

Sincerely yours,

*Dudley W. Taylor*

Dudley W. Taylor

DWT/ck 15.02005
DeCesare.5.25.06
cc:    Client
        Louis S. Moran III, President Inter-Agency Insurance Service, Inc.

**DEFENDANT'S COPY**

## CHRONOLOGY OF EVENTS

1.  <u>April 24, 2005</u> – Fire loss occurs.

2.  <u>April 24, 2005</u> – <u>December, 2005</u> – Insured attempts to work with adjuster Robert Smith. The insured also engages the services of a contractor recommended by Smith. Although no appraisals are undertaken by either the insured or Smith, Smith takes the position that co-insurance is applicable based on comparing the effective insurance coverage with what Smith determines to be the replacement of the insured property. Smith also informs insured that the coinsurance applicable to the "business income (and extra expense) coverage", is based on utilization of gross receipts. The insured consults attorney Dudley W. Taylor ("Taylor").

3.  <u>December 14, 2005</u> – Taylor writes to the insurer with a copy to Smith. Taylor asserts that even using the replacement cost format, the policy coverage amount exceeded the 90% coinsurance factor. Taylor further points out that the definition of the coinsurance feature in the policy booklet refers to the "value of Covered Property at the time of loss." Further, that all of the examples refer to value at the time of loss and makes no mention of replacement cost. Taylor further asserts that although Smith has attempted to use replacement cost in determining whether the coinsurance penalty is applicable, that in contrast, he has utilized value as opposed to replacement cost for determining the amount to be paid with respect to the loss. A copy of page 46 of the policy booklet is enclosed with the letter reflecting that the Replacement Cost feature was included with respect to each of the 3 buildings and the business personal property. Taylor also takes issue with the application of the coinsurance feature to the business interruption coverage in that Smith has attempted to utilize gross receipts in determining whether the coinsurance is applicable. Finally, Taylor advises of the difficulties that the insured has had with the contractor referred by the adjuster, with the contractor attempting to charge the insured a cost multiplier of up to 400%, in addition to applying 20% for overhead and profit.

4.  <u>December 19, 2005</u> - Smith responds through letter dated December 19, 2005, asserting "errors in your analysis of the loss and coverage under the policy of insurance." Smith offers no support for this assertion, but promises "a paragraph by paragraph analysis within the next week(s)." Smith also asserts that "the restoration contractor" was "brought to the loss by the agent, Inter-Agency Insurance Services, Inc.." Smith also proposes a "face to face meeting" to review the facts of this case and resolve any "coverage" issues that do exist. He further asserts that he has undertaken to retain "the services of a Professional Property Appraisal" to "render a professional opinion as to the replacement cost of all the insured property as of April 24, 2005." **[Smith therefore proposed to obtain an appraisal as to the replacement cost, disregarding the letter of December 14, 2005, and the enclosed policy pages where it is provided that coinsurance is determined by value and not replacement cost.]**

5.  <u>December 23, 2005</u> – The agent (Inter-Agency Insurance Services, Inc.) responded to Smith's letter of December 19, 2005, taking exception with the assertion by

DEFENDANT'S COPY

Smith that the agent referred the restoration contractor. The agent confirmed that it was an employee of the insurer who recommended this restoration contractor.

6.  December 23, 2005 - Smith writes through letter dated December 23, 2005, apparently with the intention of providing the "paragraph by paragraph analysis" touted in the prior letter of December 19, 2005. However, he completely ignores the first and most pressing question and aggravation expressed in Taylor's letter. That has to do with whether coinsurance is determined by replacement cost or actual value. The policy not only refers to value as opposed to replacement cost, but that should be determined as of the date the property was insured or in other words, the first day of the policy year. Smith dismissed Taylor's expressed concerns on this point by stating that since he "did not include any specific language or examples, we are at a loss to respond to this allegation." [that is nonsensical. Taylor's letter quoted the policy language and included a copy of the page on which the insured was relying.] Smith then continues at the top of page 2 by saying that the limit was "based on blanket building and business personal property, replacement cost with a 90% coinsurance clause." Again, Smith makes no effort to address the issue and indeed, either deliberately avoids it or simply does not even understand the issue. There is some nonsensical language about how the policy was delivered to the insured on July 5, 2004, and that they have no record that the insured questioned any part of the policy. No, he does not. He simply wants to enforce the policy as the insurer wrote it. On page 2 of Smith's letter, he appears to be addressing the third paragraph of Taylor's letter, but again ignores the issue. He asserts that the "agent presented some replacement cost values as did Mr. Grantham and Indiana Insurance." That simply avoids the issue of whether the coinsurance feature is triggered on the basis of comparing the insurance coverage with the value of the property or the replacement cost of the property. As noted above, Smith repeatedly attempted to use replacement cost for purposes of penalizing the insured with the coinsurance feature and then purported to use actual value for purposes of paying for the damage. That is one heck of a double whammy. Smith also asserts in this page 2 that he is "hiring an independent, commercial property appraiser to determine the replacement cost value as of the date of loss, for all the property." [As of 6 months later, this had not happened and no more mention is being made of it.] Of course, Smith again refers to "replacement cost value" without any acknowledgement that this is the very issue at the heart of the coinsurance factor. Much of page 3 consists of Smith asserting that "he does not have any idea" what is being said. He also disputes the proposition that business income loss was determined by using gross receipts. However, it certainly does appear that the calculation has at least the effect of using gross receipts. Also on page 4, Smith again asserts that "the contractor was brought to the loss by the agency."

7.  December 29, 2005 – Letter from Taylor on this date first pointed out the error by Smith in asserting that the restoration contractor was brought in by the agent. Taylor also acknowledged that the insurer was hiring an independent commercial appraiser to determine the replacement cost value. Taylor also pointed out that he had previously enclosed copies of pertinent pages of the policy booklet which Smith had asserted that he did not have. Taylor also then took issue with Smith's statement that the insured should submit a "sworn statement of proof of loss." Taylor reminded that although the fire

DEFENDANT'S COPY

occurred in April, 2005, the insured had not yet been provided by the insurer with the appropriate form to use, despite the elapse of 8 months.

8. <u>December 30, 2005</u> – Letter from Taylor wherein Taylor expresses his amazement at the fact that the insurer is just now retaining an appraiser. He expresses more amazement that Smith continues to ignore the fact that the policy does not utilize the term "replacement cost" in determining whether coinsurance is applicable, yet Smith continues to insist that he is going to have it appraised at replacement cost.

9. <u>January 5, 2006</u> – Letter from Smith in which he admits his error in asserting that the agent was responsible for bringing the contractor onto the job.

10. <u>January 5, 2006</u> (second letter to Taylor) – Smith asserts that he does not see any merit in "arguing over page 13 vs. page 16" or that he "look at page 46 of the policy booklet." **Amazing! Smith apparently does not believe the policy language or policy booklet should be of much consequence.** Smith now for the first time proposes a face to face discussion. [**In May of 2006, Smith's successor now asserts that the insured will have to identify each and every issue in writing ahead of time before there will be any such meeting.**] Smith again asserts that he is hiring an independent appraiser "to valuate the replacement cost of the property at risk." Again, there is not any indication that Smith understands that the primary question raised by the insured through the correspondence to date is how the insured can assert that replacement cost is determinative as to the coinsurance feature, when the policy refers only to value. Smith also acknowledges that he had not previously asked the insured to submit a proof of loss.

11. <u>January 10, 2006</u> – Letter from Taylor to Smith wherein Taylor points out that although Smith purports to distain any review of the various pages of the policy, it is that policy language which will be controlling as to the dispute. Taylor further chides Smith for his continuing consistence upon hiring an appraiser to determine the "replacement costs" without ever responding to the inquiry of Taylor and the insured as to what that has to do with coinsurance in light of the policy language.

12. <u>January 15, 2006</u> – In Smith's letter he asserts that the page number 13, as provided to him, "did not appear in our copy of the policy form." He further asserted that he had no idea what page 46 of the policy booklet listed or included. **In short, Smith acknowledges that he has spent 8 months attempting to "adjust" this loss without even knowing the terms of the policy.** Smith then again insists upon a face to face meeting.

13. <u>January 20, 2006</u> – Letter from Taylor where Taylor asserts that in his review of exchange of correspondence he cannot see that Smith has responded to a single point. Further, that upon being advised of pertinent provisions in the policy, Smith simply evaded any meaningful discussion.

14. <u>January 31, 2006</u> – Letter from Smith to Taylor where he first asserts that the file reflects "actual cash value payments" have been made for all of the submitted damage or

DEFENDANT'S COPY

repairs. However, Smith totally ignores the fact that the insured paid for cost coverage and that this was pointed out to Smith more than a month prior to this letter. Smith again proposes to meet face to face to discuss the issues.

15.  February 2, 2006 – Letter from Taylor where Taylor first states his belief that no one on behalf of the insured is going to attempt to correct the errors made by Smith, since letters addressed to others at the company are responded to only by Smith. Taylor also noted Smith's request in his letter of January 31, 2006, to "kindly specify what points remain unanswered" and that Smith would be "happy to respond." Taylor then enclosed copies of the prior correspondence and went through them on an item by item basis pointing out the policy language which conflicted with the positions taken by Smith.

16.  February 10, 2006 – Letter from Mark A. Anderson where Anderson succinctly answers and confirms the position taken by Taylor and the insured which is that the policy at issue "is endorsed for replacement cost coverage." Anderson further informs that the policy language provides payment for only the actual cash value until such time as replacement cost repairs have been completed. In 2 sentences, Anderson managed to provide more information and respond in a logical manner, than Smith was able to do in multiple pages of correspondence over 2 months. Anderson also informed that the case would be assigned to another adjuster, that being Anthony Decesare.

17.  February 14, 2006 – Letter from Taylor to Anderson where Taylor expresses his pleasure at finally seeing the acknowledgement that the policy does indeed provide for replacement cost coverage. Taylor also expressed his appreciation for transferring the claim to another adjuster.

18.  March 6, 2006 – Letter from the new adjuster DeCesare. If possible, this letter was even less helpful and responsive than the letters from Smith. Among other things, DeCesare asserted that "we are unable to determine what the claim being made by you and Mr. Grantham is." He went on to assert that he was "holding the Proof of Loss without action at this time pending completion of our investigation." He then added the usual gibberish disavowing any admission of liability and continuing "to require strict adherence to all policy of insurance terms and conditions." DeCesare did note Smith's suggestion that a meeting take place and he indicated his agreement that such a meeting would be helpful. He also enclosed several pages with numbers on them but offered no explanation.

19.  March 10, 2006 – Letter from Taylor to DeCesare. Taylor first informed that he would have the insured complete a duplicate of the sworn statement with his signature now to be acknowledged by a notary public, although it was not certain from DeCesare's letter that he was insistent on that. Taylor pointed out that the form of the sworn statement was confusing, including the fact that there is no reference on the first page to schedule B. Taylor further asserted that the controversy was attributable almost in its entirety to the insistence of Smith on applying the coinsurance feature based on replacement cost and then proposing to pay only based on actual value.

DEFENDANT'S COPY

20.   <u>March 17, 2006</u> – Letter from Taylor to DeCesare, enclosing a duplicate of the sworn statement of Proof of Loss, this time acknowledged by a notary public.

21.   <u>March 24, 2006</u> – This letter picked up again with DeCesare's incoherent method of communication; i.e., "we remain unable to determine what the claim being made." He again devoted 2 paragraphs to what is apparently his standard blah-blah that his letter is not intended to waive any requirements, etc., that the insurer will continue to require strict adherence, blah-blah.

22.   <u>March 29, 2006</u> – Letter from Taylor to DeCesare. Taylor expressed his frustration and identified several questions, most of which were carry overs from the days when Smith was handling the case. Taylor also pointed out that no previous claim for documentation had been made and if documentation is desired, that DeCesare identify precisely what is being requested.

23.   <u>March 30, 2006</u> - Letter from DeCesare to Taylor. DeCesare apparently attempted to answer Taylor's questions, by first stating them and then setting out what apparently was intended to be an answer. Not only are the answers incomprehensible, but he did not even state the questions correctly. On page 4 he asserts that "we have valued the property and determined that the insured does not comply with the coinsurance condition as it pertains to claims made at Replacement Cost." **What the heck does that mean? When did they value the property?** Although Smith kept asserting in December and January that he had hired an appraiser, we have never been provided with an appraisal. The reference to having "valued the property" cannot be anything more than some estimates based on general information and certainly not anything made by an independent appraiser. He further asserts that the insured "has not submitted a formal Replacement Cost claim as required by the policy, and therefore, we are unable to review, etc." Again, what does that mean? The only letter provided on behalf of the insurance company which made any sense was that from Anderson and he clearly acknowledged that there was a replacement cost endorsement. The claim made by Grantham informally and then formally made through the sworn proof of loss, is based on replacement value.

24.   <u>May 5, 2006</u> – Letter from Taylor to DeCesare. Taylor informed or confirmed, is perhaps a better word, that the insured had agreed to the request first from Smith and now from DeCesare, that there be a face to face meeting to discuss the issues. Taylor informed that he thought it would be a waste of time but that the client's decision was controlling. Taylor further noted that the client had been attempting to get in touch with DeCesare to arrange a meeting, but that he would not return the call. Further, that Christy Ransone of Taylor's office would attempt now to arrange such a meeting.

25.   <u>May 8, 2006</u> – After urging that a face to face meeting be held, DeCesare now takes the position that no such meeting will be held until a number of conditions are satisfied. First, is to detail the specific questions "so that they may be answered." This is ridiculous, since these questions have been asked over and over again in correspondence without any coherent response or answer. DeCesare also asserted that no meeting could

DEFENDANT'S COPY

be held unless the attorney "agreed to it in writing." Of course, Taylor's letter to DeCesare of May 5, 2006, constituted a written request. The next condition is that all "requested information and documentation in support of the insured's claim must first be submitted so that they have an advance opportunity to review it. Further, Smith must be present for the meeting. And it goes on and on, blah, blah, blah, without saying anything. Of course, DeCesare closes with his standard line that "the insurer is not waiving any of the terms of the policy and it will require strict adherence to all policies of the insurance terms and conditions." DeCesare also proposes that the meeting be held on "March 23, 24, 25 or 30."

26.    <u>May 9, 2006</u> – Letter from Smith to Taylor correcting his prior letter and informing that the available dates would be in May rather than March.


Lm/grantham.15.02005
chronology

**DEFENDANT'S COPY**



UNITED STATES POSTAGE

$ 07.09
0004615966    MAR 04 2009
MAILED FROM ZIP CODE 37243

02 1A

PITNEY BOWES

FIRST CLASS

**CERTIFIED MAIL**

7008 1830 0000 6982 0121

STATE OF TENNESSEE
DEPARTMENT OF COMMERCE AND INSURANCE
500 JAMES ROBERTSON PARKWAY
NASHVILLE, TENNESSEE 37243

7008 1830 0000 6982 0121
NETHERLANDS INSURANCE COMPANY, TH
2908 POSTON AVENUE, % C S C
NASHVILLE, TN 37203

3/3/09